CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED
8/22/2019
JULIA C. DUDLEY, CLERK
BY: s/ J. Vasquez
        DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| BRYAN ATCHARIYAKORNCHAI, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. 5:18-cv-00036 |
| v. ) | |
| ) | By: Elizabeth K. Dillon |
| FREDERICK COUNTY SANITATION ) | United States District Judge |
| AUTHORITY, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION**

Plaintiff Bryan Atchariyakornchai brings this action against his former employer, Frederick County Sanitation Authority (FCSA). He asserts claims of hostile work environment, discrimination, and retaliation based on race and ethnicity in violation of Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e (Title VII).[1] (Compl. ¶¶ 79–93, Dkt. No. 1-1.) Pending before the court is FCSA's motion for summary judgment, seeking judgment as a matter of law on all claims. (Dkt. No. 21.) The motion has been fully briefed and argued. For the following reasons, the court will grant FCSA's motion.[2]

I. FACTUAL BACKGROUND

This action arises out of Plaintiff's employment with FCSA, beginning in 2006. FCSA operates two waste water treatment plants: Crooked Run and Parkins Mill. Plaintiff, an Asian male, was hired by Henry Sliwinski, the superintendent of water treatment at FCSA, as the chief

---

[1] Plaintiff also asserted a claim for disparate treatment, harassment, demotion, and discharge under the Virginia Fraud Against Taxpayers Act, Va. Code § 8.01-216.8, but the court previously dismissed that claim by order entered September 30, 2018. (Dkt. No. 20.)

[2] In considering FCSA's motion for summary judgment, the court does not rely on the declarations filed by FCSA because they were not signed under penalty of perjury.

operator of the Crooked Run treatment plant. (Sliwinski Dep. 6–8, Dkt. No. 22-20; Pl. Dep. 11, Dkt. No. 22-23.)

**A. Influent and Effluent Testing**

The Virginia Department of Environmental Quality (DEQ) oversees FCSA's plants and issued a permit to FCSA. Va. Code § 62.1-44.2, *et. seq*. The waste water treatment plants use the process of waste water reclamation to return treated water to local creeks and rivers. This process requires testing of the influent, which is water and solids coming into the plant, and of the effluent, which is water that is returned to creeks and streams after testing and treatment. (Brode Dep. 110, Dkt. No. 22-8; Grim Dep. 49–50, 63–64, Dkt. No. 22-12; Sliwinski Dep. 11, 12–14.) While the DEQ permit contains specific requirements for effluent testing, FCSA is responsible for mandating testing of the influent. (Grim Dep. 87.)

In accordance with the posted Standard Operating Procedures at Crooked Run, employees are required to take an influent testing sample twice a week. These samples provide information that is relevant to the DEQ permits. (Alger Dep. 115–19, 156–57, Dkt. No. 22-6; Grim Dep. 46; DEQ Permit, Dkt. No, 22-9 at 90.) The data gathered from testing the influent impacts the water treatment process. For example, testing the influent helps to determine how much pollution is in the water. (Sliwinski Dep. 12.) Sampling and testing at FCSA is expected to be accurate and true with regard to the results of the sample, the time taken, and the person who took the sample. (*Id.* at 13.) The DEQ permit requires that the samples and measurements "shall be taken at the permit designated or approved location and be representative of the monitored activity." (DEQ Permit, Dkt. No. 22-9 at 111.)

Plaintiff was trained on how to conduct influent testing in accordance with FCSA policies and DEQ requirements. (Sliwinski Dep. 42–43; Pl. Dep. 44–45, 63.) Although influent testing

2

was not required for the DEQ permit, Plaintiff understood that the testing was to "make the best environment for the microbes so they don't die," and to ensure that the effluent testing is accurate and done well. (Pl. Dep. 62–63.) Influent and effluent testing results were recorded on "bench sheets" at both waste water treatment plants. (Sliwinski Dep. 12–14.)

**B. Plaintiff and Alger**

When Plaintiff worked as the chief operator at Crooked Run, he was responsible for evaluating Marcus Alger's job performance. Alger works for FCSA as a wastewater treatment plant operator. (Alger Dep. 9–10.) For about nine years, Alger and Plaintiff worked well together. (Alger Dep. 10, 152–53.) However, in early 2016, Sliwinski began meeting with Plaintiff and Alger to discuss their lack of cooperation. Sliwinski considered both men to be at fault for the issues between them. (Sliwinski Dep. 24.) In March 2016, Sliwinski issued a written warning to both Plaintiff and Alger about their failure to improve their work relations. The letter stated that Plaintiff would have the ability to continue in his job if he could "set aside disagreements and cooperate" with Alger. It also said that if Plaintiff and Alger were unsuccessful, a "managerial intervention" would be considered. (Dkt. No. 22-7 at 12.) Sliwinski tried to remedy the situation by separating Plaintiff and Alger so that they worked together during only one day of the week. (Sliwinski Dep. 32.)

In May 2016, Sliwinski received a letter from Alger complaining about Plaintiff's "work ethic, judgement, [sic] and leadership." Sliwinski gave Plaintiff an opportunity to respond to these complaints. (Dkt. No. 22-7 at 25.) In his response, Plaintiff said that it would be difficult to work with Alger going forward and that he would step down and work full time at the Parkins Mill plant while Alger assumed the chief operator position at Crooked Run "if that is what management wants." (Dkt. No. 22-23 at 258–59.) Sliwinski believed that Plaintiff had agreed

to the demotion, (Sliwinski Dep. 41, 51; *see also* Pl. Dep. 136; Compl. ¶ 44 ("One week after acquiescing in this demotion . . . .")), and Plaintiff was officially demoted from his position as chief operator in July 2016. (Pl. Dep. 139.) From the perspective of Angela Mason, the human resources manager at FCSA, Plaintiff was demoted because he was not adequately performing his job duties and he agreed to the demotion. (Mason Dep. 5–6, 13.) Daniel Brode[3] took over as chief operator of Crooked Run in July 2016.

In July 2016, Plaintiff emailed Brode, Sliwinski, Greg Grim,[4] and Alger, stating that he filled out paperwork for Alger because certain data was missing. He also asked, "are we not doing the comp ph and temp any more if not maybe someone can let me know," referring to the information that he alleged was missing from Alger's paperwork. Alger responded that he had done the testing and recorded the data but had written the results on a separate sheet of paper that he eventually filled in, and Sliwinski accepted this explanation. (Dkt. No. 22-7 at 38.)

**C. Plaintiff's Post-Dated Bench Sheet and Subsequent Termination**

On October 18, 2016, Plaintiff was working at the Crooked Run plant when he took an influent sample and recorded it on a bench sheet that he dated October 19, 2016. (Pl. Dep. 13–14; Alger Dep. 88–93, 156–57, Dkt. No. 22-7 at 65–67.) Alger took a photo of this bench sheet and emailed it to Brode, Sliwinski, and Michael Newlin,[5] stating: "I just wanted to share this picture of [Plaintiff] falsifying government documents. This is the third time I've turned him in for this." (Dkt. No. 22-23 at 212–13.) Alger believed that Plaintiff's method of recording was wrong because he was "taking the sample, doing his test on the sample that day, leaving it out in

---

[3] Daniel Brode has worked as the chief operator at Crooked Run since Plaintiff was terminated and as the assistant chief operator at Parkins Mill since approximately 2013. (Brode Dep. 7–10, 156.)

[4] Greg Grim works as the chief operator of the Parkins Mill plant. (Grim Dep. 6–8.)

[5] Michael Newlin is the assistant director and chief engineer at FCSA.

the sink, and then the next day he would write the next day's date on it and the next day's time that he made up." (Alger Dep. 12.) Alger told Plaintiff multiple times before the October 2016 email to stop doing this. (Alger Dep. 11–12.) During one of the earlier occasions when Alger told Brode about Plaintiff's practice of recording data, Brode questioned Plaintiff and asked why he did not follow the standard method.[6] (Brode Dep. 18; Alger Dep. 11–12.)

On October 19, Plaintiff took another influent sample and "it was exactly the same," so he did not change the data recorded from the day before. Plaintiff also took an effluent sample and recorded that information on the same bench sheet from the day before that was dated October 19. (Pl. Dep. 56–62, 89.)

On the morning of October 19, Brode—then Plaintiff's supervisor—went to Crooked Run to investigate what Alger had emailed him. He found Plaintiff's bench sheet at Crooked Run and compared it to the picture of a bench sheet that Alger had emailed him, Sliwinski, and Newlin. The pH and temperature recordings on the bench sheets were the same. (Brode Dep. 19.) When Brode saw Plaintiff, he asked if he had taken the influent sample the day before, like the picture sent by Alger reflected, despite the fact that he had already spoken to him once before about not using this method. (Brode Dep. 21–22.) Plaintiff claims he told Brode that he had taken another influent sample that day (Pl. Decl. ¶ 20); however, Brode remembers Plaintiff acknowledging that he did not take another influent sample on October 19, since he already had one from the day before. Brode reiterated that they were not supposed to take the influent pH samples the day before the date of recording and that the samples needed to be taken and recorded on the same day, according to the standard methods. (Brode Dep. 22–23, 29; Pl. Dep.

---

[6] According to Brode, the standard method of a grab sample is a fifteen-minute test, and thus, someone "cannot grab it on day A and say that [they] got it on day B and it be a good sample, because by definition it is a fifteen-minute holding time. That is it." (Brode Dep. 18.)

5

49.) Plaintiff understood that he was not supposed to be filling out data a day in advance. (Pl. Dep. 42–44.) Brode and Plaintiff began arguing at which point Plaintiff told Brode that he thought focusing on his mistakes and not others' was "discrimination." (Pl. Dep. 20–21, 32–36.)

Sliwinski spoke to Brode on October 19 about Plaintiff's bench sheet. (Sliwinski Dep. 43–44.) He reviewed the bench sheet himself and asked Brode if the picture Alger sent was legitimate. Brode said that it was and suggested that Plaintiff be written up. Sliwinski responded that Plaintiff would be fired, not written up, because of the seriousness of falsifying documents. He then told Brode and Plaintiff they there were to go to Parkins Mill for a meeting later that day. (Brode Dep. 31, 38–41.)

On October 19, Plaintiff was called into a meeting at the Parkins Mill plant. Sliwinski, Newlin, and Brode were present at that meeting. (Sliwinski Dep. 53; Brode Dep. 41–42.) Brode brought the bench sheet in question. (Brode Dep. 43–44.) At this meeting, Plaintiff did not say that he took another influent sample on October 19. (Sliwinski Dep. 54.) Rather, he "admitted to taking the sample on the 18th and recording it as being done on the 19th." (*Id.* at 55, 58.) After Sliwinski questioned Plaintiff about the October 18–19 sample and bench sheet, Plaintiff was terminated on October 19, 2016.[7] (*Id.*; Pl. Decl. ¶ 2.)

## II. DISCUSSION

### A. Summary Judgment Standard

Under Rule 56, summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists only where the record, taken as a whole, could lead a reasonable jury to return a verdict in favor of the non-moving party. *Ricci v. DeStefano*, 557

---

[7] In his declaration, Plaintiff notes that he told Sliwinski he "thought this was discrimination." (Pl. Decl. ¶ 29.) However, Sliwinski testified that the first time he heard of Plaintiff complaining of discrimination was when Mason told him Plaintiff filed an EEOC complaint after his termination. (Sliwinski Dep. 48–49.)

U.S. 557, 586 (2009). In making that determination, the court must take "the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc) (quoting *Ausherman v. Bank of Am. Corp.*, 352 F.3d 896, 899 (4th Cir. 2003)).

A party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Moreover, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ." *Id.* at 247–48. Instead, the non-moving party must produce "significantly probative" evidence from which a reasonable jury could return a verdict in his favor. *Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 924 (4th Cir. 1990) (quoting *Anderson*, 477 U.S. at 249–50). "While courts must take special care when considering a motion for summary judgment in a discrimination case because motive is often the critical issue, summary judgment disposition remains appropriate if the plaintiff cannot prevail as a matter of law." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 958–59 (4th Cir. 1996).

**B. Applicable Law**

Title VII prohibits practices that "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). This includes discrimination with respect to employment decisions having a direct economic impact, like terminations or demotions, as well as actions that create or perpetuate a discriminatory or abusive working environment. *See Vance v. Ball State Univ.*, 570 U.S. 421, 426–27 (2013). Title VII further prohibits an employer from retaliating against an employee for opposing any discriminatory

7

practice proscribed by Title VII.

Pursuant to Title VII, Plaintiff claims that FCSA subjected him to a hostile work environment and took several discriminatory employment actions against him. He further asserts that when he complained about the alleged discrimination, FCSA terminated him in response.

**C. Hostile Work Environment**

Plaintiff first claims that the harassment he endured created a hostile work environment for which FCSA should be held liable. In response, FCSA points out that Plaintiff's EEOC charge excluded the facts on which Plaintiff relies to form his hostile work environment claim. Accordingly, FCSA argues that Plaintiff failed to exhaust his administrative remedies with regard to this claim such that the court should dismiss it.

"Before a Title VII plaintiff can bring a formal suit, he must file an administrative charge with the Equal Employment Opportunity Commission . . . . This charge frames the scope of future litigation." *Chacko v. Patuxent Inst.*, 429 F.3d 505, 506 (4th Cir. 2005). Indeed, "[o]nly those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent Title VII lawsuit." *Evans*, 80 F.3d at 963. Accordingly, "a plaintiff fails to exhaust his administrative remedies where . . . his administrative charges reference different time frames, actors, and discriminatory conduct than the central factual allegations in his formal suit." *Chacko*, 429 F.3d at 506.

Plaintiff focuses his hostile work environment claim on actions taken by Steve Nicholson, the lab manager at Parkins Mill. (Mem. Opp'n Mot. Summ. J. 16–17.) Specifically, Nicholson told Plaintiff he "despised" him and made derogatory comments toward Plaintiff— including calling plaintiff a "blow-in" and telling him to "open his eyes" when he "was looking

for something." Nicholson allegedly also made physical threats, saying that he wanted to "take it outside" and "have it out" with Plaintiff. At times, Nicholson kicked Plaintiff out of the lab or prevented him from entering the lab even though Plaintiff needed access to the lab in order to complete his duties with FCSA. Nicholson also "refused" to certify Plaintiff in biochemical oxygen demand testing—although, according to Plaintiff, he "had demonstrated initial competence" and "was proficient at the test"—while certifying Plaintiff's coworkers. (Pl. Dep. 128–31; Pl. Decl. ¶¶ 3–6; Nicholson Dep. 8; Grim Dep. 80–81.) Plaintiff claims that he complained about this behavior to Sliwinski, but Sliwinski did not act on his complaint. (Pl. Decl. ¶ 6.)

However, Plaintiff omitted these allegations from his EEOC charge, which does not include any allegations related to his hostile work environment claim or any allegations against Nicholson. (Dkt. No. 22-22 at 70.) For this reason, FCSA argues that this claim should be dismissed. The court agrees. Plaintiff failed to exhaust his administrative remedies regarding his hostile work environment claim, and the claim will be dismissed.

**D. Disparate Treatment**

Plaintiff claims FCSA discriminated against him based on his race. To evaluate Title VII claims when, as here, there is no direct evidence of discriminatory intent, courts apply the burden-shifting analysis outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, if an employee establishes a prima facie case of discrimination by a preponderance of the evidence, the burden shifts to the employer to set forth a legitimate, non-discriminatory reason for the adverse employment action. *McDonnell Douglas Corp.*, 411 U.S. at 802–03; *see also Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981). Once the employer articulates such a reason, the burden shifts back to the plaintiff to establish by a

preponderance "that the employer's non-discriminatory rationale is a pretext for intentional discrimination." *Heiko v. Colombo Sav. Bank, F.S.B.*, 434 F.3d 249, 258 (4th Cir. 2006) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)).

Here, Plaintiff has not presented direct or circumstantial evidence of discrimination. As such, the court will analyze his discrimination claims under the familiar burden-shifting framework set forth in *McDonnell Douglas*. Thus, Plaintiff bears the burden to establish a prima facie case of discrimination by showing: (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class. *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010).

Although Plaintiff is a member of a protected class and alleges several adverse employment actions,[8] he has not established that he satisfactorily performed his job or that FCSA treated him differently than similarly situated employees outside the protected class.

1. **Satisfactory job performance**

The evidence establishes that FCSA viewed Plaintiff's job performance as unsatisfactory. Among other things, Plaintiff failed to maintain working relationships with his subordinates when he served in a supervisory role and, significantly, he falsified records by post-dating influent samples even after numerous warnings from other FCSA employees and supervisors about doing so. (Alger Dep. 11–12, 88, 93, 156–57; Brode Dep. 18; Pl. Dep. 13–14; Sliwinski

---

[8] Specifically, Plaintiff suggests that his demotion, the "lack of any appraisal in 2016," and his termination are each relevant adverse employment actions. (Mem. Opp'n Mot. Summ. J. 19.) Plaintiff included the "lack of appraisal" as an adverse employment action in his response to FCSA's motion for summary judgment; however, he did not include similar allegations in his complaint. Moreover, even if FCSA failed to provide an appraisal, such failure would not constitute an adverse employment action. *See James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 377 (4th Cir. 2004) (noting that even a "poor performance evaluation 'is actionable only where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment'" (quoting *Spears v. Missouri Dep't of Corr. & Human Res.*, 210 F.3d 850, 854 (8th Cir. 2000))). Plaintiff has shown no connection between his lack of appraisal and subsequent changes to the terms of his employment.

Dep. 24; Dkt. No. 22-7 at 12.)

Beginning in 2016, Plaintiff's relationship with Alger deteriorated to a point where Sliwinski had to become involved. (Sliwinski Dep. 24.) In March 2016, Plaintiff received a written warning about his inability to cooperate with Alger, and, ultimately, the dispute led to Plaintiff's demotion. (Dkt. No. 22-7 at 12.) Notably, FCSA's human resources department believed the demotion was due, at least in part, to Plaintiff's poor job performance. (Mason Dep. 5–6, 13.)

More importantly, Plaintiff failed to follow instructions set forth by FCSA's influent and effluent testing policies and by his supervisors. He admits that he post-dated an influent sample, (Pl. Decl. ¶ 20), and acknowledged that his argument with Brode on the morning of October 19 was about the bench sheet he "filled out *wrong*." (Pl. Dep. 34.) Plaintiff was previously warned about his practice of recording incorrect data by Alger and Brode. (Alger Dep. 11–12; Brode Dep. 18.)

Altogether the evidence does not support Plaintiff's narrative that he "had at least satisfactory job performance," (Mem. Opp'n Mot. Summ. J. 17), but instead demonstrates a history of poor performance beginning at least in early 2016. Regardless, even if Plaintiff could show he excelled in his position with FCSA, he has failed to present sufficient evidence that FCSA treated similarly situated employees differently or that FCSA's legitimate reason for terminating Plaintiff was merely pretextual.

   **2. Different treatment than similarly situated employees outside the protected class**

"[A] prima facie case of discrimination is established if the plaintiff shows that he 'engaged in prohibited conduct similar to that of a person of another race . . . and . . . that disciplinary measures enforced against the plaintiff were more severe than those enforced against

11

the other person.'" *Kelley v. United Parcel Serv., Inc.*, 528 F. App'x 285, 286 (4th Cir. 2013) (unpublished) (quoting *Moore v. City of Charlotte*, 754 F.2d 1100, 1105–06 (4th Cir. 1985)). "Accordingly, plaintiffs are required to show that they are similar in all relevant respects to their comparator. Such a showing would include evidence that the employees 'dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct . . . .'" *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010) (unpublished) (alteration in original) (citations omitted) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)).

Plaintiff first argues that FCSA's management treated his disputes with coworkers differently than other employees. He also notes that FCSA did not give him any supervisory authority over the disciplinary or hiring process, contrasting his advancement through the ranks of FCSA with Brode's. (Mem. Opp'n Mot. Summ J. 19–20.) However, Plaintiff has presented no evidence that Brode or any other employees holding the same positions or dealing with the same supervisors engaged in the same contentious conduct with subordinates that led to Plaintiff's warnings or demotion. Accordingly, there is no adequate comparator through which to review FCSA's alleged discrimination.

The majority of Plaintiff's remaining arguments on this point appear to stem from FCSA's different treatment of Alger. First, Plaintiff claims that FCSA disciplined the two differently when their disagreements created a strained working relationship. However, the record clearly indicates that FCSA disciplined and met with both Plaintiff and Alger regarding their lack of cooperation. In fact, Sliwinski issued a written warning to both individuals and attempted to separate them to prevent future conflict. (Sliwinski Dep. 23–25, 32.) FCSA did not treat Plaintiff differently in his dispute with Alger.

Plaintiff also claims that FCSA's management took different approaches to investigating allegations against him and Alger regarding falsified data on bench sheets. (Mem. Opp'n Mot. Summ. J. 19–20.) Again, however, several differences exist between Alger's conduct and Plaintiff's. In July 2016, Plaintiff sent a vague email to Sliwinski in which Plaintiff complained about Alger's alleged failure to take samples or falsification of records. However, he failed to include any documentation or evidence to back up his complaint. (Pl. Dep. 91–93.) In fact, there is no evidence that Alger falsified documents. Rather, Alger explained that he had completed his assigned testing but simply recorded the information on a separate sheet of paper because the official paperwork was at the other plant. (Dkt. No. 22-7 at 38.). In contrast, when Plaintiff post-dated his influent sample, Alger provided documented proof of the bench sheet that he accused Plaintiff of falsifying. (Dkt. No. 22-7 at 64–67.) And, when given an opportunity to explain, Plaintiff "admitted to taking the sample on the 18th and recording it as being done on the 19th." (Sliwinski Dep. 55.) Altogether, the evidence before the court highlights the dissimilar context in which FCSA's different treatment of Alger and Plaintiff occurred. As Plaintiff and Alger cannot be said to have been "similarly situated," the disparate treatment does not indicate discriminatory action by FCSA.

Plaintiff's remaining arguments are similarly unpersuasive. For example, he argues that FCSA did nothing to address his exclusion from the lab after his disagreement with Nicholson. He also suggests that other operators and chief operators were not disciplined for failing to give "positive feedback." (Mem. Opp'n Mot. Summ. J. 19–20.) Yet, he has not identified any FCSA employees to which he was similarly situated. He also has not suggested that FCSA intervened or failed to intervene in any other disputes between coworkers or that FCSA ever disciplined him for failing to provide positive feedback. Although Plaintiff has listed numerous examples of

13

actions that may have been unfavorable to him, he has provided insufficient evidence that FCSA treated any similarly situated employees any differently. Accordingly, Plaintiff has failed to meet his burden as to this prong of his disparate treatment claim.[9]

### 3. Pretext

Even if Plaintiff had successfully established a prima facie case of discrimination, FCSA set forth a legitimate, non-discriminatory reason for both demoting and terminating Plaintiff, and Plaintiff has not offered any evidence indicating that those reasons were merely pretextual.[10] Importantly, it is the decision maker's perception rather than the self-assessment of the plaintiff that is determinative of whether an employee has met his employer's legitimate expectations at the time of his termination. *Arthur v. Pet Dairy*, 593 F. App'x 211, 217 (4th Cir. 2015)

---

[9] Plaintiff also argues that FCSA is liable under the "cat's paw" theory. (Mem. Opp'n Mot. Summ. J. 23–24.)

> The Supreme Court has held cognizable the "cat's paw" theory of liability against an employer under the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), recognizing both that "[a]n employer's authority to reward, punish, or dismiss is often allocated among multiple agents," *Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1192 (2011), and that "[t]he one who makes the ultimate decision does so on the basis of performance assessments by other supervisors." *Id.* at 1192–93. The Court held that "if a supervisor performs an act motivated by antimilitary animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under USERRA." *Id.* at 1194 (footnote omitted). *Staub* was limited to the USERRA, and the Fourth Circuit has adopted a more stringent standard under Title VII, where the "biased subordinate" was, in effect, that actual decisionmaker. *Hill*, 354 F.3d at 289. For instance, a subordinate harboring unlawful intent may be deemed the actual decisionmaker "where the supervisor's reports and recommendation were merely rubber-stamped by the formal decisionmaking committee." *Id.* at 291.

*Somerset v. Spartannash Assocs., LLC*, No. 1:17CV00016, 2018 WL 1830739, at *5 n.4 (W.D. Va. Apr. 17, 2018.)

However, here, there is no evidence that Sliwinski, Newlin, or Brode were motivated by any racial animus. Sliwinski clearly stated that Plaintiff's actions constituted a terminable offense.

[10] Although Plaintiff provides multiple theories on why he believes FCSA's reasons for taking adverse employment actions were merely pretextual, it is unclear whether he advances these theories in support of his disparate treatment claim or his retaliation claim. Regardless, his contention is unsupported, and he cannot show based on the evidence presented that FCSA's decision was pretextual.

(unpublished); *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 280 (4th Cir. 2000). "[W]hen an employer articulates a reason for discharging the plaintiff not forbidden by law, it is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) (quoting *Giannaopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410–11 (7th Cir. 1997)).

With regard to Plaintiff's demotion, not only did FCSA warn Plaintiff that an inability to cooperate with subordinates may result in a "managerial intervention," but Plaintiff also agreed to a demotion based on his continued dispute with Alger. (Dkt. No. 22-7 at 12; Dkt. No. 22-23 at 258–59.) FCSA's human resources department indicated that both considerations played a role in Plaintiff's demotion. (Mason Dep. 5–6, 13.) Plaintiff has identified no evidence suggesting this reasoning was pretextual.

Similarly, the evidence does not indicate that FCSA's reason for terminating Plaintiff was pretextual or motivated by any underlying discriminatory motive. Plaintiff attacks FCSA's reasoning by suggesting that Sliwinski knew of Plaintiff's practice of post-dating bench sheets because Sliwinski had come to the plant and seen him collect samples. In Plaintiff's view, if falsifying records were serious enough to warrant termination, FCSA would have terminated him earlier instead of waiting until the October 19 meeting. Thus, he reasons that his termination for post-dating the documents in this instance must have been pretextual. (Mem. Opp'n Mot. Summ. J. 22.) Plaintiff is simply speculating. (Pl. Dep. 50, 67–68.) There is no evidence that Sliwinski approved of this practice, and the October 18–19 incident was the first time he knew of it happening. (Sliwinski Dep. 15.) In fact, Sliwinski considered this to be a serious offense and considered it to be falsification worthy of termination. (*Id.* at 18.)

15

Plaintiff further claims that he took another influent sample in the morning on October 19, and that if the influent readings had changed from the night before, he would have revised the bench sheet. (Pl. Dep. 89.) He appears to argue that by telling Brode about the October 19 test, he effectively informed all of the FCSA employees present in the termination meeting later that day.[11] (Pl. Decl. ¶ 20.) However, Plaintiff's supervisors knew only that he falsified the information on the bench sheet. Even if he did retest the influent data on the morning of October 19, he did not inform anyone of the retest during his termination meeting. The evidence thus shows that the decision makers knew of Plaintiff's error, but not of the potentially mitigating factor Plaintiff now brings forth. Based upon the information before the decision makers at the meeting, then, Plaintiff's action warranted his firing.

There is no evidence from which a reasonable factfinder could determine that FCSA's termination decision relied on anything other than Plaintiff's improper "falsification" of records and his problematic history with coworkers. Plaintiff has not set forth sufficient evidence to establish that discrimination was the reason for his termination. Thus, summary judgment is appropriate on Plaintiff's discrimination claim.

**E. Retaliation**

Title VII makes it an "unlawful employment practice for an employer to discriminate against any of his employees . . . because [an employee] has opposed any practice" prohibited by Title VII. 42 U.S.C. § 2000e-3(a). When there is no direct evidence of retaliation, to establish a prima facie case, a plaintiff must show that (1) he engaged in a protected activity; (2) that the employer acted adversely against him; and (3) that there was a causal connection between the protected activity and the asserted adverse action. *Strothers v. City of Laurel, Md.*, 895 F.3d 317,

---

[11] While Brode has a different recollection of their conversation on the morning of October 19 and refutes that that the 7:48 a.m. notation was taken on October 19, the facts must be viewed in the light most favorable to the Plaintiff at the summary judgment stage. (Brode Dep. 34–35.)

327 (4th Cir. 2018). If a plaintiff establishes a prima facie case of retaliatory discrimination, the burden then shifts to the employer "to show that its purportedly retaliatory action was in fact the result of a legitimate non-retaliatory reason." *Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015). If the employer makes this showing, the burden shifts back to the plaintiff to demonstrate that the employer's purported non-retaliatory reasons "were not its true reasons, but were a pretext for discrimination." *Id.* (quoting *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004)). In evaluating pretext, courts are not to act as "a kind of super-personnel department weighing the prudence of employment decisions." *Sharif v. United Airlines, Inc.*, 841 F.3d 199, 206 (4th Cir. 2016) (quoting *DeJarnette*, 133 F.3d at 299.

It is undisputed that Plaintiff suffered an adverse employment action and therefore satisfies the second requirement of the prima facie case. However, the evidence does not support Plaintiff's contention that he engaged in protected activity or that FCSA terminated his employment because of such activity. Plaintiff has also failed to show that FCSA's purported legitimate, non-retaliatory reasons for the adverse actions were merely pretextual.

1. **Protected activity**

The first issue here is whether Plaintiff engaged in protected activity prior to any alleged retaliation. "Protected activities fall into two distinct categories: participation or opposition. An employer may not retaliate against an employee for participating in an ongoing investigation or proceeding under Title VII, nor may the employer take adverse employment action against an employee for opposing discriminatory practices in the workplace." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998) (citation omitted). Plaintiffs "are protected if, at the time of their complaint, they 'have an objectively reasonable belief in light of

17

all the circumstances that a Title VII violation has happened or is in progress.'" *Strothers*, 895 F.3d at 327 (quoting *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 282 (4th Cir. 2015)).

Plaintiff suggests that his complaint to Brode about discriminatory treatment on the morning of October 19 constituted protected activity. (Compl. ¶ 92.) Complaints to an employer about discrimination may constitute protected activity under Title VII, but only when the employee reasonably believes such discrimination exists. *Strothers*, 895 F.3d at 327. After several warnings not to post-date bench sheets, Plaintiff could no longer reasonably believe Brode's confrontation about the falsification was motivated by discriminatory intent and not poor job performance.[12] Regardless, even assuming the totality of the circumstances surrounding Plaintiff's termination could support Plaintiff's belief that FCSA discriminated against him, Plaintiff still has failed to meet the remaining requirements of a retaliation claim.

2. **Causation**

Plaintiff has not put forth sufficient evidence to show a causal connection between protected activity and his termination. The Supreme Court has emphasized that a Title VII retaliation claim requires that the complaint be the but-for cause of the retaliatory action. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013). It is insufficient that an employer had a "mixed motive" when taking action. *Foster*, 787 F.3d at 249. Rather, "retaliation plaintiffs . . . must be able to prove that 'the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.'" *Id.* (quoting *Univ. of Tex. Sw. Med. Ctr.*, 570 U.S. at 360).

---

[12] Again, to the extent Plaintiff emphasizes the lack of any disciplinary action against Alger as evidence of discrimination against Plaintiff, it is important to note that FCSA did not have any substantial evidence that Alger had similarly falsified records. Plaintiff may have accused Alger of incorrectly documenting his influent and effluent testing, but Alger adequately explained his methods to FCSA's management when confronted. Thus, Plaintiff's reliance on this supposedly disparate treatment is similarly unreasonable.

18

Plaintiff has not satisfied the standard required to demonstrate a causal connection. He has not shown a causal link between his statements to either Brode or Sliwinski that their actions were discriminatory and termination of his employment. There is no evidence that Brode told Sliwinski before the termination meeting about Plaintiff's claim of discrimination. Plaintiff admitted that he does not know whether Brode told this to Sliwinski. (Pl. Dep. 100–01.) Even if Plaintiff complained of discrimination to Sliwinski during the termination meeting, he has nonetheless failed to show that his complaint was the but-for cause of his termination. Rather, the evidence supports FCSA's contention that Sliwinski terminated Plaintiff for falsifying bench sheets.

Furthermore, Plaintiff's assertion that the temporal proximity between Plaintiff's complaints in the mid-morning and his termination in the mid-afternoon is "more than sufficient to provide a proximate causal link," is incorrect. All the evidence shows that Plaintiff was fired for filling out the bench sheets in a way that his supervisors found unacceptable. Plaintiff's argument relying on temporal proximity is simply not enough.

In addition, Plaintiff's retaliation claim fails because the record does not demonstrate that FCSA's legitimate, non-retaliatory reason for terminating his employment was pretextual. The record clearly indicates that Plaintiff's supervisors believed that he had falsified the bench sheets, contrary to company policy.

For all of these reasons, summary judgment is also appropriate on Plaintiff's retaliation claim.

III.  CONCLUSION

For the foregoing reasons, the court will GRANT defendant's motion for summary judgment.  (Dkt. No. 21.)  An appropriate order will be entered.

Entered: August 22, 2019.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge